# United States Court of Appeals for the Federal Circuit

05-1087

CALIFORNIA INDUSTRIAL PRODUCTS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.


Mark L. Austrian, Collier Shannon Scott, PLLC, of Washington, DC, argued for plaintiff-appellee. With him on the brief was Robin H. Gilbert. Of counsel was Michael R. Kershow.

Mikki Graves Walser, Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellant. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, of Washington, DC; and Barbara S. Williams, Attorney in Charge, of New York, New York. Of counsel on the brief was Chi S. Choy, Attorney, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Judge Evan J. Wallach

# United States Court of Appeals for the Federal Circuit

05-1087

CALIFORNIA INDUSTRIAL PRODUCTS, INC.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  February 1, 2006

_____

Before MICHEL, <u>Chief Judge</u>, SCHALL, and GAJARSA, <u>Circuit Judges</u>.

SCHALL, <u>Circuit Judge</u>.

## DECISION

The United States appeals from the final decision of the United States Court of International Trade in <u>California Industrial Products, Inc. v. United States</u>, 350 F. Supp. 2d 1135 (Ct. Int'l Trade 2004).  In its decision, the court granted the motion of California Industrial Products, Inc. ("CIP") for summary judgment and denied the government's cross-motion for summary judgment.  In granting CIP's motion, the court overturned the

ruling of the United States Customs Service ("Customs")[1] that CIP was not entitled to manufacturing substitution drawbacks under 19 U.S.C. § 1313(b) (1994)[2] based upon its exportation of steel scrap. The court held that Customs erred in denying CIP's drawback claims because, before doing so, it failed to conduct notice and comment proceedings. Such proceedings were required under 19 U.S.C. § 1625(c), the court determined, because Customs' denial of CIP's claims represented, in the words of that statute, a modification of the favorable "treatment previously accorded by [Customs] to substantially identical transactions." The court held that Customs was bound by this previous favorable treatment. We affirm.

BACKGROUND

I.

Under 19 U.S.C. § 1313, a manufacturer is entitled to recover a portion of previously paid Customs duties on imported merchandise that is subsequently exported or destroyed. In essence, the statute operates to give a party a refund on Customs duties. The refund is called a drawback.[3] Subsection (b) of section 1313 allows for

---

[1]     Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002).

[2]     Generally, the provisions of the United States Code (1994) relating to drawback that were in effect in 1995, the relevant period of time, are cited. Section 1313(b), which governs manufacturing substitution drawback, has not been amended since 1995.

[3]     A "drawback" is currently defined in 19 C.F.R. § 191.2(i) as "the refund or remission, in whole or in part, of a customs duty, fee or internal revenue tax which was imposed on imported merchandise under Federal law because of its importation . . . ." 19 C.F.R. § 191.2(i) (2005). In 1995, a "drawback" was defined similarly as "a refund or remission, in whole or in part, of a customs duty, internal revenue tax, or fee lawfully assessed or collected because of a particular use made of the merchandise on which the duty, tax or fee was assessed." 19 C.F.R. § 191.2(a) (1995). The purpose of

manufacturing substitution drawbacks, through which a manufacturer may receive a drawback when the manufacturer substitutes the same "kind and quality" of goods for those that were actually originally imported. Section 1313(b) provides:

> If imported duty-paid merchandise and any other merchandise (whether imported or domestic) of the same kind and quality are used in the manufacture or production of articles within a period not to exceed three years from the receipt of such imported merchandise by the manufacturer or producer of such articles, there shall be allowed upon the exportation, or destruction under customs supervision, of any such articles, notwithstanding the fact that none of the imported merchandise may actually have been used in the manufacture or production of the exported or destroyed articles, an amount of drawback equal to that which would have been allowable had the merchandise used therein been imported . . . .

19 U.S.C. § 1313(b). In order to receive a manufacturing substitution drawback pursuant to section 1313(b), a manufacturer files a drawback claim requesting payment. 19 C.F.R. § 191.2(i) (1995).[4]

For the purpose of simplifying the drawback claiming process for certain common manufacturing operations, Customs issues offers in the form of general manufacturing drawback contracts. Id. §§ 191.2(f), 191.41.[5] A manufacturer who meets the requirements of a general manufacturing drawback contract may accept Customs' offer by submitting a letter notifying Customs of its intent to comply with the general contract.

---

(Cont'd. . . .)
allowing drawbacks is two-fold: to increase foreign commerce and to promote domestic manufacturing. United States v. Int'l Paint Co., 35 C.C.P.A. 87, 90 (1948).

[4] The regulations governing drawback were amended in 1998. See 63 Fed. Reg. 10970 (Mar. 5, 1998). In this opinion, we cite to the regulations as in effect in 1995. Except as otherwise noted, the current regulations, see 19 C.F.R. § 191.1 et seq. (2005), do not differ materially from the regulations as in effect in 1995.

[5] When it amended the drawback regulations in 1998, Customs changed the name of general drawback contracts to "general drawback rulings," 63 Fed. Reg. at 10973. 19 C.F.R. §§ 191.1(p), 191.7.

Id. §§ 191.2(f), 191.42(b). Customs then notifies the manufacturer of its receipt of the letter of intent. Id. § 191.43. The contract is effective for fifteen years from the date of Customs' acknowledgement of receipt.[6] Id. The manufacturer may then file individual drawback claims that comply with the general drawback contract. Id. § 191.45. If an individual drawback claim is denied, the manufacturer may file a protest with Customs pursuant to 19 U.S.C. § 1514. An individual's right to a manufacturing substitution drawback under section 1313(b) is limited by 19 U.S.C. § 1313(*l*), which makes "the privileges provided for in this section . . . subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe . . . ." 19 U.S.C. § 1313(*l*). The regulations are made binding on officers of Customs by 19 U.S.C. § 1502(b).

In addition to 19 U.S.C. § 1313(b) and the associated regulations, when dealing with drawback claims, the Secretary of the Treasury (the "Secretary") also must comply with the procedural requirements of 19 U.S.C. § 1625(c). Under section 1625(c), the Secretary must follow notice and comment procedures before issuing an interpretive ruling or decision that would change a preexisting "treatment." Section 1625(c) provides in relevant part:

> A proposed interpretive ruling or decision which would--
> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
> shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during

---

[6]  Under the regulations currently in effect, a general manufacturing drawback contract lasts indefinitely unless no claims are filed for five years or the manufacturer or producer files a request to terminate the contract. 19 C.F.R. §§ 191.7(d), 191.8(h) (2005).

> not less than the 30-day period after the date of such publication, <u>comments</u> on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

19 U.S.C. § 1625(c) (1994) (emphases added).[7]

In 2002, the Secretary promulgated regulations expressly defining "treatment previously accorded by the Customs Service to substantially identical transactions" as set forth in 19 U.S.C. § 1625(c). <u>See</u> 19 C.F.R. § 177.12(c) (2005). Subsection (c)(1)(i) sets forth what must be shown to establish "substantially identical transactions" that give rise to a "treatment." Subsection (c)(1)(ii) establishes guidelines for case-by-case inquiries as to whether particular transactions involve sufficient Customs review to form the basis of a "treatment." The evidentiary burden for establishing a "treatment" is set forth in subsection (c)(1)(iv). This case concerns subsection (c)(1)(iii), which limits the "substantially identical transactions" that may form the basis of a section 1625(c) "treatment" to only the transactions of the person alleging entitlement to section 1625(c)'s notice and comment process. 19 C.F.R. § 177.12(c)(1)(iii) provides in relevant part:

> The issuance of an interpretive ruling that has the effect of modifying or revoking the treatment previously accorded by Customs to substantially identical transactions must be in accordance with the procedures set forth in paragraph (c)(2) of this section. <u>The following rules will apply for purposes of determining under this section whether a treatment was previously accorded by Customs to substantially identical transactions of a person</u>:

---

[7]     The statutory provisions cited are those that were in effect at the time CIP's drawback claims were formally denied in January of 1998. No substantive amendments have been made to 19 U.S.C. § 1625 have been made since that time.

(iii) Customs will not find that a treatment was accorded to a person's transactions if:

(A) <u>The person's own transactions were not accorded the treatment in question</u> over the 2-year period immediately preceding the claim of treatment . . . .

19 C.F.R. § 177.12(c)(1)(iii) (emphases added).  Thus, under the regulations enacted in 2002, a "treatment" arises only as the result of "substantially identical transactions" involving the person claiming the benefit of section 1625(c).  <u>See</u> <u>id.</u> § 177.12(c)(1)(iii)(A).  Also in 2002, Customs repealed 19 C.F.R. § 177.9(e).  That provision contained language suggesting that transactions could be "substantially identical" so as to form a "treatment" even if they did not involve the person claiming the benefit of section 1625(c).

II.

CIP operates steel conversion mills that manufacture flat-rolled steel sheet products.  CIP purchases the steel it uses for its products from domestic trading companies, which previously paid Customs duties when importing the steel.  These domestic trading companies factor the Customs duties into the price CIP pays them for the steel.  In CIP's mills, cold-rolled sheets of steel are trimmed to the desired size, rolled in coils, and sold to customers.  Trim or steel scrap is the material trimmed off the sheets and may be re-smelted to make new steel products.  CIP exports the steel trim or scrap it produces in its manufacturing process and seeks to obtain drawback on this product.

On February 16, 1994, CIP sent a letter of intent to comply with Treasury Decision ("T.D.") 81-74, 15 Cust. B. & Dec. 176 (Mar. 31, 1981).[8] CIP revised its letter of intent on October 25, 1995, to add several additional factories that would be operating under T.D. 81-74. T.D. 81-74 comprises a general drawback contract for manufactured steel articles composed of duty-paid steel or steel of the same kind or quality under 19 U.S.C. § 1313(b). Id. at 176-77. T.D. 81-74 creates a specific exception for "waste":

> The drawback claimant understands that no drawback is payable on any waste which results from the manufacturing operation. Unless the claim for drawback is based on the quantity of steel appearing in the exported articles, the drawback claimant agrees to keep records to establish the value (or the lack of value), the quantity, and the disposition of any waste that results from manufacturing the exported articles. If no waste results, the drawback claimant agrees to keep records to establish that fact.

T.D. 81-74, 15 Cust. B. & Dec. at 178. Neither CIP's original February 16, 1994 letter nor its revised October 25, 1995 letter of intent to comply with T.D. 81-74 mentioned that CIP intended to claim a manufacturing substitution drawback for steel trim or scrap. Cal. Indus. Prods., 350 F. Supp. 2d at 1137-38.

Pursuant to its letter of intent to comply with T.D. 81-74, CIP filed twenty-six drawback claims between December 2, 1995 and March 7, 2002. Id. at 1138. Two of these claims are at issue in this case.[9] The bill of lading for each of these two claims

---

[8]    When Customs amended the drawback regulations in 1998, it required that general drawback contracts be published in Appendix A of 19 C.F.R. Part 191, Subpart A. 19 C.F.R. § 191.7(b). T.D. 81-74 is now listed as "General Manufacturing Drawback Ruling Under 19 U.S.C. 1313(b) For Steel (T.D. 81-74)." 19 C.F.R. § 191, Subpart A, App. A, XII (2005).
[9]    Although only two claims are involved in the present appeal, there are eleven other claims that have been suspended pending the outcome of this litigation.

stated that part of the claim involved "Iron and Steel Scrap." Id. at 1138. On January 2, 1998, Customs denied both claims on the ground that scrap was not eligible for a drawback. Id. In so doing, Customs stated, "CANNOT CLAIM ON SCRAP," and, "DRAWBACK IS NOT ALLOWED ON SCRAP."

Prior to the denial of CIP's claims, between June of 1992 and November of 1997, Customs liquidated 145 entries for drawback on steel scrap. The entries were filed by five companies other than CIP, including Calstrip Steel Corporation ("Calstrip") and Precision Specialty Metals, Inc. ("Precision"). CIP approached the consulting firm that assisted these five companies in filing drawback claims in October of 1995 with a request for aid in obtaining drawback for steel scrap. The firm agreed to assist CIP in this endeavor. However, in 1996, after CIP filed its first claims for drawback, but before it had received any decision, Customs began denying drawback claims for steel scrap made by other companies such as Calstrip and Precision. In response to Calstrip's claims for drawback on steel scrap, Customs issued Headquarters Ruling Letter ("HQ") 227375 on October 10, 1997, denying the claims. HQ 227375, slip op. (Oct. 10, 1997), available at 1997 WL 897192. In HQ 227375, Customs ruled that steel scrap was "waste" and therefore not eligible for drawback. HQ 227375, slip op. at 1. Based on HQ 227375, Precision's claims for drawback on steel scrap also were denied. Precision successfully challenged the denial of its drawback claims for steel scrap in the Court of International Trade. Precision Specialty Metals, Inc. v. United States, 116 F. Supp. 2d

_____

(Cont'd. . . .)
Cal. Indus. Prods., 350 F. Supp. 2d at 1138 n.9. CIP received accelerated payments for all thirteen of these claims. Id. Customs then demanded return of the accelerated payments on steel scrap on the ground that it was not eligible for drawback. Id. at 1138.

1350 (Ct. Int'l Trade 2000) ("Precision I"); Precision Specialty Metals, Inc. v. United States, 182 F. Supp. 2d 1314 (Ct. Int'l Trade 2001) ("Precision II").[10]

CIP responded to Customs' denial of its claims for drawback on steel scrap by timely filing a request for further review in the form of a protest. In the protest, CIP argued that Customs had impermissibly retroactively changed its practice regarding drawback claims, that certain types of valuable waste are entitled to drawback, and that Customs had erred when it found that steel scrap was waste. On March 3, 1998, Customs issued a protest review decision affirming the January 2, 1998 denial of CIP's drawback claims. Customs based its denial of CIP's protest on HQ 227375.

---

[10] Like CIP, Precision filed claims with Customs for drawback on steel scrap. Although Customs initially granted 69 drawback claims to Precision, it began denying Precision's claims in 1996. Precision I, 116 F. Supp. 2d at 1354-55. Precision challenged Customs' decision in the Court of International Trade, alleging, among other things, that the denial of its claims without first following notice and comment procedures violated section 1625(c). Responding to cross-motions for summary judgment, the court conducted a lengthy analysis of section 1625(c) and determined that Customs' liquidation of 69 of Precision's claims for drawback on steel scrap constituted a "treatment" under section 1625(c) because they involved more than a single transaction. Id. at 1377. However, the court found that Precision had failed to come forward with evidence demonstrating the existence of other factors necessary to trigger the procedural requirements of section 1625(c), making summary judgment inappropriate. Id. at 1378-79.

As the parties were preparing for trial, the Court of International Trade decided that the issues before it were, in fact, entirely legal. It therefore directed the parties to move again for summary judgment. Precision II, 182 F. Supp. 2d at 1316. In Precision II, the Court of International Trade reiterated its interpretation of "treatment" under section 1625(c) from Precision I and found, again, that Customs' actions in granting Precision's claims prior to 1996 comprised a "treatment." Id. at 1328-29. It then granted summary judgment in favor of Precision on the ground that Customs had failed to comply with section 1625(c) when it denied Precision's drawback claims—thereby reversing that treatment—without first engaging in a notice and comment process. Id. at 1329-30.

III.

CIP timely filed suit in the Court of International Trade challenging Customs' denial of its protest. See 28 U.S.C. § 2636(c) (2000). The Court of International Trade exercised jurisdiction over CIP's suit pursuant to 19 U.S.C. § 1581(a).

In due course, CIP and the United States filed cross-motions for summary judgment. In its motion, CIP urged the Court of International Trade to adhere to the interpretation of the term "treatment" in 19 U.S.C. § 1625(c) that it had adopted in Precision I, 116 F. Supp. 2d at 1374, and Precision II, 182 F. Supp. 2d at 1323-28. CIP also argued that the "substantially identical transactions" that form the basis of a "treatment" in section 1625(c) may be transactions of parties other than the person claiming that section 1625(c)'s notice and comment process applies. As a result, CIP urged, under section 1625(c), Customs was required to engage in a notice and comment process before changing the favorable treatment previously accorded to claims for drawback on steel scrap. Because Customs did not do so, CIP argued, it was bound by that favorable treatment in CIP's case. Plaintiff's Motion for Summary Judgment at 9-10. Thus, CIP contended that the fact that CIP itself had not previously been afforded drawbacks on steel scrap did not preclude the Court of International Trade from finding that a "treatment" was established through Customs' actions toward the "substantially identical" claims of other steel scrap exporters. Id.

In its cross-motion for summary judgment, the government did not dispute the Court of International Trade's finding in Precision I and Precision II that Customs' grants of drawback with respect to Precision formed the basis of a "treatment" with respect to Precision. Defendant's Motion for Summary Judgment at 14. However, the

05-1087                                    10

government argued that because 19 U.S.C. § 1625(c) is silent as to whether the "treatment" afforded a company like Precision can be applied to a second company like CIP, the regulation set forth at 19 C.F.R. § 177.12(c)(1)(iii)(A) should be afforded deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Defendant's Motion for Summary Judgment at 8-9. The government argued that, under 19 C.F.R § 177.12(c)(1)(iii)(A), drawback claims filed by other companies, such as Calstrip and Precision, did not constitute "substantially identical transactions" that CIP, another company, could point to as giving rise to a "treatment" under section 1625(c). Defendant's Motion for Summary Judgment at 10.

The Court of International Trade granted CIP's motion for summary judgment and denied the government's cross-motion. The court rejected the government's suggestion that it give Chevron deference to the Customs regulation at 19 C.F.R. § 177.12(c)(1)(iii)(A). Doing so, the court concluded, would amount to impermissible retroactive application of the regulation. Cal. Indus. Prods., 350 F. Supp. 2d at 1141-42. Likewise, the court declined to give deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944), to Customs' HQ 227375 because it concluded it did not represent a consistent agency position. Cal. Indus. Prods., 350 F. Supp. 2d at 1140-41. Instead, the court accepted CIP's invitation to adopt the Precision I and Precision II courts' interpretation of "treatment" in section 1625(c)(2). Id. at 1142-45. The court was persuaded that a "treatment" can be established through Customs' transactions with other companies, id. at 1145, and reasoned that CIP had demonstrated that Customs had established a "treatment" under section 1625(c) with respect to drawbacks for steel scrap based on Customs' grants of drawback to other companies. Consequently, the

court ruled, Customs violated the procedural requirements of section 1625(c) when, before denying CIP's drawback claims, it changed that "treatment" without following notice and comment procedures. Id. at 1147. The court therefore held that Customs was "bound by and subject to its earlier treatment of steel scrap as eligible for drawback."[11] Id. at 1148.

The government has timely appealed the Court of International Trade's decision. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I.

The Court of International Trade properly grants summary judgment "when there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Sea-Land Serv. Inc. v. United States, 239 F.3d 1366, 1371 (Fed. Cir. 2001) (quoting Ct. Int'l Trade R. 56(d)). We review a grant of summary judgment by the Court of International Trade "for correctness as a matter of law, deciding de novo the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist." Guess?, Inc. v. United States, 944 F.2d 855, 857 (Fed. Cir. 1991).

II.

On appeal, the government argues first that the alleged violation of section 1625(c) was not raised before the agency and therefore was not properly heard for the first time by the Court of International Trade. According to the government, the court

---

[11] The court stated that its ruling was limited to the facts of "this case" and should not be deemed precedential for claims of drawback on steel scrap filed subsequent to the publication of its opinion. Id.

"should have remanded the matter as it relates to section 1625(c)(2) to allow Customs to apply its regulations and carry out its administrative functions as charged by Congress." Consequently, the government argues, under the doctrine of "primary jurisdiction" we may not consider the issue.

On the merits of the section 1625(c) issue, the government raises several arguments in support of reversing the Court of International Trade's ruling that Customs violated 19 U.S.C. § 1625(c) when it denied CIP's claims. As seen above, section 1625(c) requires that Customs follow notice and comment procedures before issuing an "interpretive ruling or decision which would . . . have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions." The government contends that two provisions of section 1625(c) are not implicated by its actions regarding CIP and that, therefore, section 1625(c) is inapplicable. First, the government argues that none of Customs' actions with respect to CIP comprised an "interpretive ruling or decision" under section 1625(c). Second, the government argues that section 1625(c) does not apply in this case because the previously liquidated claims upon which CIP asserts that it relied were not "substantially identical transactions." Relying solely on the terms of Precision's contract, the government claims that there are substantial differences between the drawback contracts of the parties that previously were allowed drawback and CIP's drawback contract. The government also claims that the Court of International Trade erred when it did not afford Chevron deference to its regulation at 19 C.F.R. § 177.12(c)(1)(iii)(A). As noted, that regulation limits the reach of the notice and comment requirement of section 1625(c) to the situation in which Customs issues an interpretive ruling with

respect to a person and that ruling has the effect of modifying or revoking the treatment previously accorded to "substantially identical transactions" of that person. Thus, the government argues that the Court of International Trade erred in ruling that the 145 previously liquidated claims for drawback on steel scrap, which were not claims of CIP, were "substantially identical transactions" to CIP's drawback claims.

Additionally, the government contends that the Court of International Trade erred in its interpretation of 19 U.S.C. § 1625(c) because its construction conflicts with the overall statutory scheme for drawback, particularly 19 U.S.C. § 1313(*l*) and 19 U.S.C. § 1502(b). Finally, the government urges that steel scrap is waste for which CIP was not entitled to a drawback and that its ruling letter to that effect, HQ 227375, should be afforded deference under Skidmore.

Responding to the government's arguments, CIP argues first that the government's violation of section 1625(c) was properly raised before the Court of International Trade. According to CIP, an alleged violation of section 1625(c) is not the type of claim that first must be raised before Customs.

Turning to the merits of the section 1625(c) issue, CIP states that, in the Court of International Trade, it was challenging a protest review decision, which CIP asserts was a "decision" within the meaning of section 1625(c). Alternatively, CIP states that Customs' decision to deny its drawback claims was based on HQ 227375, which CIP asserts also is a "ruling" within the meaning of section 1625(c). With regard to the government's argument that Customs' prior liquidations of other companies' claims for drawback on steel scrap did not constitute "substantially identical transactions" under section 1625(c) because there are substantial differences between the drawback

contracts of those parties and CIP's drawback contract, CIP argues that there are only insubstantial differences in the other companies' letters of intent to comply with T.D. 81-74 and CIP's letter of intent. Next, CIP addresses the government's argument that Customs' previous drawback allowances were not "substantially identical transactions" so as to form the basis of a "treatment" with respect to CIP. CIP urges that we should not accord <u>Chevron</u> deference to the definition of what constitutes "substantially identical transactions" giving rise to a "treatment" that is contained in the regulation at 19 C.F.R. § 177.12(c)(1)(iii)(A). CIP asks us to hold that the numerous grants of drawbacks for scrap issued to other companies, like Precision, were "substantially identical transactions" vis-à-vis CIP's drawback claims so that they formed a "treatment" for purposes of 19 U.S.C. § 1625(c). CIP argues that because section 1625(c) applies to Customs' actions towards it, the Court of International Trade correctly granted summary judgment that Customs violated section 1625(c) by denying CIP's claims for drawback without first following notice and comment procedures.

With regard to the government's assertion that the Court of International Trade's interpretation of section 1625(c) conflicts with 19 U.S.C. § 1313(*l*) and 19 U.S.C. §1502(b), CIP argues that the court's ruling does not impermissibly restrict the Secretary's ability to act under either statute. Finally, CIP contends that the Court of International Trade properly gave no deference to HQ 227375, in which Customs ruled that steel scrap is not eligible for drawback because it is waste.

III.

We see no error in the Court of International Trade's holding that, pursuant to 19 U.S.C. § 1625(c), Customs was required to engage in a notice and comment process

before issuing HQ 227375. We therefore affirm the court's decision granting CIP's motion for summary judgment and denying the government's cross-motion.

A.

As a preliminary matter, we reject the government's argument that the doctrine of "primary jurisdiction" is a bar to our review of whether the government violated 19 U.S.C. § 1625(c). The doctrine of "primary jurisdiction" requires that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." Nippon Steel Corp. v. United States, 219 F.3d 1348, 1353 (Fed. Cir. 2000) (quoting Far E. Conference v. United States, 342 U.S. 570, 574 (1952)). The government correctly notes that Customs' violation of 19 U.S.C. § 1625(c) was not explicitly raised in CIP's protest or in its summons in the Court of International Trade. It then argues that, under the doctrine of "primary jurisdiction," we should remand to Customs for it to decide in the first instance the section 1625(c) issue. We do not agree. We are not asked in this case to make any factual determinations that should be reserved for Customs under the doctrine of "primary jurisdiction." Compare Union Pac. R.R. Co. v. United States, 111 F. Supp. 266, 268 (Ct. Cl. 1953) (finding that a legal question as to which of two rates apply was not reserved exclusively for the agency), with Nippon Steel, 219 F.3d at 1354-55 (noting that the inquiry as to whether an antidumping order was circumvented must first be heard by the agency because of "expertise and experience" required to make complex factual determinations). Instead, the alleged violation of section 1625(c) presents purely legal questions regarding the construction of "interpretive ruling or decision" and

"substantially identical transactions." Therefore, the doctrine of "primary jurisdiction" does not require us to remand to Customs the issue of whether Customs violated section 1625(c) when it denied CIP's drawback claims.

B.

Turning to the merits, section 1625(c)(2) mandates that Customs follow notice and comment procedures before issuing an "interpretive ruling or decision which would . . . have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions." 19 U.S.C. § 1625(c)(2). As noted, two aspects of section 1625(c)'s mandate are disputed by the parties: (1) whether Customs issued an "interpretive ruling or decision" with respect to CIP, and (2) whether prior transactions of companies other than CIP were "substantially identical" to CIP's transactions with Customs so that they constituted a "treatment."

1.

Section 1625(c) only applies when Customs issues an "interpretive ruling or decision." See Sea-Land, 239 F.3d at 1372. We think Customs did issue an "interpretive ruling or decision" to CIP in this case. Section 1625(c) is a subsection of 19 U.S.C. § 1625, which is titled "Interpretive rulings and decisions; public information." Subsection (a) of section 1625, titled "Publication," provides as follows:

> Within 90 days after the date of issuance of any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision under this Act with respect to any customs transaction, the Secretary shall have such ruling or decision published in the Customs Bulletin or shall otherwise make such ruling or decision available for public inspection.

19 U.S.C. § 1625(a) (emphases added). Thus, "interpretive ruling" is expressly defined as "including any ruling letter, or internal advice memorandum." Id. At the same time, two lines later, the text refers back to the previously noted "interpretive ruling . . . or protest review decision" as "such ruling or decision." "[I]nterpretative ruling . . . or protest review decision" and the later shorthand reference to that phrase ("such ruling or decision") should be construed consistently in section 1625. See Timex V.I., Inc. v. United States, 157 F.3d 879, 884 (Fed. Cir. 1998) ("It is well-settled that words appearing in a statute should be read consistently: a particular word appearing multiple times in a statutory provision should be given the same reading, unless there is a clear Congressional intent to the contrary."). In short, "decision" in the phrase "ruling or decision" in 19 U.S.C. § 1625(c), includes a "protest review decision." CIP is appealing from Customs' March 3, 1998 protest review decision. Furthermore, the March 3 protest review decision was based on a Customs' ruling letter, HQ 227375, which is a ruling letter and, therefore, also an "interpretive ruling" under section 1625(a). We hold that CIP is appealing from both a "decision" and a "ruling" within the meaning of 19 U.S.C. § 1625(c).

2.

Addressing the second issue relating to section 1625(c), we do not agree with the government that the statute does not apply because the prior liquidations of other companies' drawback claims were not "substantially identical" to CIP's claims. The government argues first that Precision's previously granted claims for drawback on steel scrap were not "substantially identical" because Precision's letter of intent to comply with T.D. 81-74 listed "trim," which is a synonym for scrap. See Precision II, 182 F.

Supp. 2d at 1329 (mentioning the contents of Precision's letter). In contrast, CIP's letter of intent did not list "trim" or "scrap" as a permissible item for which a drawback would be issued. However, the requirement that transactions be "substantially identical" does not require complete identity. While differences in the letters of intent to comply with a general drawback contract underlying two different transactions could conceivably render two transactions substantially different in another case, the claims of Precision and CIP were, in fact, "substantially identical" within the meaning of 19 U.S.C. § 1625(c). Both Precision's and CIP's drawback claims were based on T.D. 81-74, and Precision's and CIP's letters of intent both purported to comply with the terms of T.D. 81-74. See Precision II, 182 F. Supp. 2d at 1329. Furthermore, both companies were denied drawbacks because their bills of lading mentioned scrap, which Customs interpreted to be "waste" and therefore not eligible for drawback. See id. at 1318. There is no evidence that the mention of "trim" in Precision's original letter of intent played any role in Customs' ruling in that case or that the lack of a mention of "trim" had any effect on its ruling on CIP's claim. We thus conclude that there was only an insubstantial difference between the two companies' claims.[12]

---

[12] Additionally, Precision's claims account for just 69 of the 145 successful pre-1996 claims for drawback on steel scrap on which CIP relies. In HQ 227375, Customs describes Calstrip's letter of intent as stating "its intention to adhere to and comply with the conditions of [T.D.] 81-74 [dated March 31, 1981,] drawback contract under 19 USC 1313(b), articles manufactured using steel." Unlike Precision's letter, no mention appears to have been made of scrap or trim in Calstrip's letter of intent. Thus, at least some of the letters of intent appear to have had the same content as CIP's letter of intent and were therefore "substantially identical" even under the government's interpretation.

3.

The main issue in this case with respect to section 1625(c) is whether "substantially identical transactions" should be defined narrowly in accord with Customs' recently promulgated regulation at 19 C.F.R. § 177.12(c)(1)(iii)(A). As already seen, under section 177.12(c)(1)(iii)(A), as far as any person is concerned, "substantially identical transactions" giving rise to a "treatment" are only those transactions between Customs and that person. See 19 C.F.R. § 177.12(c)(1)(iii)(A) ("Customs will not find that a treatment was accorded to a person's transactions if the person's own transactions were not accorded the treatment in question."). Accordingly, the government contends that Customs' granting of drawbacks to other companies such as Precision could not form the basis of a "treatment" under 19 U.S.C. § 1625(c) with regard to CIP.[13]

---

[13]    In its cross-motion for summary judgment in this case, the government agreed with the holdings in Precision I and Precision II that the 69 drawback claims of Precision, which Customs paid, comprised a "treatment" with regard to Precision. In its motion, the government wrote:

> We do not dispute the Precision court's conclusion that, in spite of Customs publications, the erroneous liquidations granting drawback to Precision's claims for exported steel scrap constituted a "treatment" under 19 U.S.C. § 1625 for Precision itself. Customs also erroneously granted drawback to other claimants (i.e., Calstrip, Combined Metals of Chicago, Thypin, and Ulbrich) for their individual claims of exported steel scrap. These claimants did not get the benefit of Precision's treatment, but were erroneously accorded their own—independent—treatment by Customs.
>
> However, these erroneous liquidations cannot be expanded to include importers who were not similarly affected and for whom such expectations could not have been created. Congress could not have intended that,

Under <u>Chevron</u>, we must follow a two step inquiry to determine if deference should be given to the government's narrow definition of "substantially identical transactions" that give rise to a "treatment" in 19 C.F.R. § 177.12(c)(1)(iii)(A). First, "we must . . . carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." <u>Timex V.I.</u>, 157 F.3d at 881 (citing <u>Chevron</u>, 467 U.S. at 842-43 & n.9). Second, if Congress has not spoken to the meaning of "substantially identical transactions," then we must give effect to Customs' regulation so long as it represents a reasonable interpretation of the statute. <u>See</u> <u>Chevron</u>, 467 U.S. at 844, 846.

When determining whether Congress has expressly spoken as to the meaning of a statutory term such as "substantially identical transactions," we must utilize the "traditional tools of statutory construction." <u>Timex V.I.</u>, 157 F.3d at 882. We begin our inquiry with the plain meaning of the text of the statute itself. <u>Defenders of Wildlife v. Hogarth</u>, 330 F.3d 1358, 1366 (Fed. Cir. 2003) ("Deciphering the intent of Congress begins with the text of the statute."); <u>Timex V.I.</u>, 157 F.3d at 882 ("The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning." (citing <u>VE Holding Corp. v. Johnson Gas Appliance Co.</u>, 917 F.2d 1574, 1579 (Fed. Cir. 1990))). Section 1625(c) requires that Customs follow notice and comment procedures before issuing "[a] proposed interpretive ruling or decision" that would "have the effect of modifying the treatment previously accorded by the Customs Service to <u>substantially identical</u>

---

(Cont'd. . . .)

having made an error, Customs must then uniformly apply that error to all importers.

Defendant's Motion for Summary Judgment at 14.

transactions." 19 U.S.C. § 1625(c) (emphasis added). The statute provides no definition of the term "substantially identical transactions." However, the intent of Congress may be clear even in the absence of an express definition of the statutory term. See, e.g., Chevron, 467 U.S. at 842.

When a particular term is not expressly defined in a statute, the meaning of that term may be discerned by "look[ing] to the provisions of the whole law, and to its object and policy." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1355 (Fed. Cir. 2003) (quoting U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993)). Although section 1625 does not define "substantially identical transactions," the language of the statute indicates that Congress clearly intended transactions between Customs and multiple parties to be "substantially identical transactions." Section 1625(c) states that when it changes a prior "treatment," Customs "shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision." 19 U.S.C. § 1625(c) (emphasis added). We think that if the words "substantially identical transactions" in section 1625(c) were only meant to refer, in each case, to prior treatment accorded the person claiming entitlement to the notice and comment process of the statute, as provided in 19 C.F.R. § 177.12(c)(1)(iii)(A), it is unlikely that Congress would have required that "interested parties" be given notice of the change of a prior "treatment." In our view, use of the words "interested parties" indicates that Congress intended, contrary to 19 C.F.R. § 177.12(c)(1)(iii)(A), that "substantially identical transactions" forming the basis of a "treatment" include

transactions other than transactions of just the person before Customs claiming the right to a notice and comment process.

Customs regulations in effect at the time of the enactment of section 1625(c) also support the view that Congress intended "substantially identical transactions" forming a single "treatment" to include the transactions of multiple parties. These regulations are appropriately considered in the construction of 19 U.S.C. § 1625(c) because Congress is presumed to be aware of pertinent existing law. Bristol-Myers Squibb Co. v. Royce Lab., 69 F.3d 1130, 1136-37 (Fed. Cir. 1995) ("We presume 'that Congress is knowledgeable about existing law pertinent to legislation it enacts.'" (quoting VE Holding, 917 F.2d at 1581)); Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."); Minneapolis & St. Louis Ry. Co. v. United States, 361 U.S. 173, 187 (1959) (presuming that Congress was aware of applicable railroad regulations when enacting pertinent legislation).

In Precision I and Precision II, the Court of International Trade determined that Congress modeled 19 U.S.C. § 1625(c) after former 19 C.F.R. § 177.10. Precision I, 116 F. Supp. 2d at 1375; Precision II, 182 F. Supp. 2d at 1323-28. The court noted, in particular, the similarities between former 19 C.F.R. § 177.10(c) and 19 U.S.C. § 1625(c). Precision I, 116 F. Supp. 2d at 1375. Former section 177.10(c)(2) provided:

> Before the publication of a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice that the position (or prior ruling on which the position is based) is under review will be published in the FEDERAL REGISTER and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change. This procedure will also be followed

> when the change of position will result in a holding that an activity is not restricted or prohibited and the Headquarters Office determines that the matter is of sufficient importance to involve the interests of the general public.

19 C.F.R. § 177.10(c)(2) (1993) (amended 2002). Similar to 19 U.S.C. § 1625(c), which requires notice and comment proceedings before Customs can change a "treatment," former 19 C.F.R. § 177.10(c)(2) required Customs to follow notice and comment procedures before changing its "position." Precision I, 116 F. Supp. 2d at 1375.

Former 19 C.F.R. § 177.9(e)(1), in turn, clarifies the scope of "substantially identical transactions" that form the basis of a "treatment" for purposes of section 1625(c).[14] Former section 177.9(e)(1) provided:

> The Customs Service will from time to time issue a ruling letter covering a transaction or issue not previously the subject of a ruling letter and which has the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions of either the recipient of the ruling letter or other parties. . . .

19 C.F.R. § 177.9(e)(1) (1993) (repealed 2002). Subsection (e)(1) refers to the "treatment previously accorded by the Customs Service to substantially identical transactions of either the recipient of the ruling letter <u>or other parties</u>." Thus, when enacting § 1625(c), Congress relied on a definition of "treatment" that encompassed actions towards "other parties." Further, we think that if Congress had intended the restrictive approach to "substantially identical transactions" embodied in 19 C.F.R. § 177.12(c)(1)(iii)(A), it would have made that intention clear with express language in the statute.

---

[14] The parties are in accord that 19 C.F.R. § 177.9(e) was the basis for 19 U.S.C. § 1625(c).

The government argues that in 19 C.F.R. § 177.9(e)(1), "the words 'other parties' clearly relate only to parties who had transactions that received the treatment in question and not to parties who did not have transactions that received treatment." We do not see such "clear" indication in the former regulation. The government also attempts to discount the language of section 177.9(e) by arguing that "had Congress intended to include the language 'or other parties' from the text of section 177.9(e) in the text of section 1625(c)(2), in order to broaden the scope of the statute to include parties who had not received a 'treatment,' then it could have done so; it did not." However, the regulations in effect in 1993 refer to "substantially identical transactions" of "other parties." Thus, when Congress wrote section 1625(c), it knew that under Customs regulations, "treatment" included "substantially identical transactions" of "other parties," making it unnecessary for it to specify that it was referring to "substantially identical transactions" of a single party or multiple parties.

This construction of "substantially identical transactions" is further supported by the legislative history of 19 U.S.C. § 1625(c), which demonstrates Congress' intent to increase the transparency of Customs' actions.[15] If "substantially identical transactions"

---

[15] The only legislative history pertinent to 19 U.S.C. § 1625 reveals Congress' intent to increase the transparency of Customs' actions. It provides:

> Section 623 of H.R. 3450 amends 19 U.S.C. 1625 by requiring that interpretative rulings, ruling letters or internal advice memorandum [sic] be published within 90 days in the Customs Bulletin or otherwise be made available for public inspection. Section 623 further provides that adverse interpretative rulings may be appealed within Customs, and require that a ruling modifying or revoking an existing ruling be first published in the Customs Bulletin for notice and comment. The Secretary of the Treasury will give interested parties an opportunity to submit comments and will strictly

were limited to only the transactions of one particular person, as the government argues, a "treatment" with respect to that person would have no effect on other parties. In other words, under Customs' interpretation, a particular company would have no interest in other parties' transactions, rendering the increase in transparency of Customs' interactions with other companies served by section 1625(c) meaningless.

Our construction of "substantially identical transactions" giving rise to a section 1625 "treatment" does not conflict with either 19 U.S.C. §1313(*l*) or 19 U.S.C. § 1502(b). Both 19 U.S.C. § 1313(*l*) and 19 U.S.C. § 1502(b) give the Secretary of the Treasury the authority to promulgate regulations relating to drawback. Section 1313(*l*) makes "the privileges provided for in this section . . . subject to compliance with such rules and regulations as the Secretary of the Treasury shall prescribe . . . ." The

<hr>

(Cont'd. . . .)

enforce the 30-day comment period in order to avoid unduly delaying the process, absent extraordinary circumstances. Also, section 623 states that Customs make available all information necessary for importers to comply with applicable laws and regulations.

Section 623 requires that a decision that limits the application of a court decision shall also be published for notice and comment in the Customs Bulletin.

Reasons for change

Section 623 will provide assurances of transparency concerning Customs rulings and policy directives through publication in the Customs Bulletin or other easily accessible source.

It is the Committee's intent that the Customs Service shall be deemed to have satisfied any publication requirements mandated by this section if it disseminates such information by the U.S. Customs Service electronic bulletin board and such information remains publicly available in an accessible, retrievable format.

H.R. Rep. No. 103-361(I), at 123-24 (1993), reprinted in 1993 U.S.C.C.A.N. 2552.

Secretary's regulations are made binding on Customs officers through 19 U.S.C. § 1502(b), which mandates:

> It shall be the duty of all officers of the customs to execute and carry into effect all instructions of the Secretary of the Treasury relative to the execution of the revenue laws; and in case any difficulty arises as to the true construction or meaning of any part of the revenue laws, the decision of the Secretary shall be binding upon all officers of the customs.

19 U.S.C. § 1502(b). The government argues that the interpretation of "substantially identical transactions" in section 1625(c) adopted by the Court of International Trade conflicts with the Secretary's power to promulgate binding regulations. Under such an interpretation, the government states, the Secretary will be forced to follow "treatments" established by what it terms "aberrant decisions" of Customs officers. We do not agree. Section 1625(c), like 19 U.S.C. § 1313(*l*) and 19 U.S.C. § 1502(b), is a binding Congressional mandate that limits the Secretary's authority to make decisions when Customs officers have decided "substantially identical transactions" in a consistent manner so that a "treatment" arises. Contrary to the government's argument, the interpretation of "substantially identical transactions" that we think is correct does not limit the Secretary's authority to change a prior "treatment." It simply requires that the Secretary utilize notice and comment procedures under 19 U.S.C. § 1625(c) before doing so.

Based on the foregoing, we conclude that Congress clearly intended that "substantially identical transactions" in 19 U.S.C. § 1625(c) include transactions of parties other than the person claiming entitlement to the statute's notice and comment process. Under Chevron, this finding ends the matter because we must give effect to this clear intent of Congress. Chevron, 467 U.S. at 843; Whitman v. Am. Trucking

Ass'ns, 531 U.S. 457, 471 (2001). Because the regulation set forth at 19 C.F.R. § 177.12(c)(1)(iii)(A) is due no Chevron deference due to Congress' unambiguously expressed intent, it is unnecessary for us to reach the issue of whether the regulation is impermissibly retroactive as found by the Court of International Trade.[16] See Cal. Indus. Prods., 350 F. Supp. 2d at 1141-42 (finding that no Chevron deference was due because 19 C.F.R. § 177.12(c)(1)(iii)(A) was impermissibly retroactive). In sum, we agree with the Court of International Trade that because Customs failed to comply with section 1625(c) before it denied CIP's drawback claims, it is, in CIP's case, bound by and subject to its earlier treatment of steel scrap as eligible for drawback.

IV.

We turn now to the government's final argument. As noted, the government contends that steel scrap is waste and that HQ 227375, in which Customs held that steel scrap is waste, should be given Skidmore deference. Under Skidmore, administrative rulings or decisions that are not entitled to Chevron deference may still be "eligible to claim respect according to [their] persuasiveness." United States v. Mead Corp., 533 U.S. 218, 221 (2001). We need not address the government's Skidmore argument, however. The reason is that any argument in support of Customs' rejection of CIP's drawback claims is foreclosed by our holding in Part III. Because, contrary to 19 U.S.C. § 1625(c), Customs failed to engage in a notice and comment process before rejecting CIP's drawback claims, it is bound by and subject to, at least in this case, its earlier treatment of steel scrap as eligible for drawback. No argument seeking to undo

---

[16] This court has reached a different conclusion with regard to a different portion of the regulation as applied to a different issue under 19 U.S.C. § 1625(c). See Motorola, Inc. v. United States, Nos. 05-1025, 1041, decided today.

that state of affairs—and that includes the government's <u>Skidmore</u> argument—can be heard.

CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade granting summary judgment in favor of CIP is

<u>AFFIRMED</u>.