157 F.3d 879
 TIMEX V.I., INC., Plaintiff-Appellant,
v.
UNITED STATES, William Daley, Secretary of the Department of
Commerce, Bruce Babbitt, Secretary of the Department of
Interior, Frank Creel, Director, Statutory Import Programs
Staff,Import Administration and Department of Commerce,
Defendants-Appellees.
 No. 97-1520.
 United States Court of Appeals,
Federal Circuit.
 Sept. 23, 1998.
 
 Frank T. Judge, III, Timex Corporation, of Middlebury, Connecticut, argued for plaintiff-appellant.
 Velta A. Melnbrencis, Assistant Director, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, argued for defendants-appellees. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Bernice A. Browne, Senior Counsel, and Robert E. Nielsen, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC.
 Before MAYER, Chief Judge, PLAGER and SCHALL, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 This case presents a question of statutory construction, one of first impression. The statute at issue provides benefits on an annual basis to those companies that produce wristwatches in the United States insular possessions, e.g., the Virgin Islands. See Harmonized Tariff Schedule of the United States, § XVIII, ch. 91, Additional U.S. Note 5, para. (h)(i) (Supp. I 1995). The question presented is whether, in order to qualify for the statutory benefits for watch production in a given year, the company must be a "producer" in the insular possessions in the following year.
 
 
 2
 In response to the application of Timex V.I., Inc. ("Timex") for the statutory benefits for its 1995 Virgin Islands watch production, the U.S. Department of Commerce[1] denied Timex's application because Timex was not a "producer" in the Virgin Islands in the following year (1996). In turn, the Court of International Trade determined that the statute does not directly address the question and then affirmed Commerce's statutory construction as "reasonable." Timex V.I., Inc., v. United States, 969 F.Supp. 1345, 1347-49 (Ct. Int'l Trade 1997). Because Commerce's statutory construction is contrary to Congress's clearly expressed intent, we reverse the judgment of the Court of International Trade.
 
 BACKGROUND
 
 3
 Timex V.I., Inc., is a wholly-owned subsidiary of Timex Corporation. Timex began watch assembly operations in the Virgin Islands in 1986, and there at various times through 1995 employed up to 120 people and assembled up to 700,000 watches annually. However, in response to changing market conditions, Timex determined that its Virgin Islands assembly operations were no longer economically viable and that it would therefore cease those operations by the end of 1995. In July 1995, Timex informed Commerce of its planned closing of its Virgin Islands facility.
 
 
 4
 The statutory benefits at issue are specified in paragraph (h) of note 5 of the Additional U.S. Notes to Chapter 91 of Section XVIII of the Harmonized Tariff Schedule of the United States (Supp. I 1995).[2] Paragraph (h) of note 5 reads in relevant part:
 
 
 5
 (h) (i) In the case of each calendar year beginning after December 31, 1982, and before January 1, 2007, the Secretaries, acting jointly, shall:
 
 
 6
 (A) verify the wages paid by each producer to permanent residents of the insular possessions during the preceding calendar year; and
 
 
 7
 (B) issue to each producer (not later than March 1 of such year) a certificate for the applicable amount.
 
 
 8
 (ii) ... "[A]pplicable amount" means an amount equal to the sum of:(A) 90 percent of the producer's creditable wages ... during the preceding calendar year of the first 300,000 units; plus
 
 
 9
 (B) the applicable graduated declining percentage ... of the producer's creditable wages ... during the preceding calendar year of units in excess of 300,000 but not in excess of 750,000.
 
 
 10
 Accordingly, by its terms the statutory provision provides a rebate for wages paid by watch manufacturers in the insular possessions in any given year. The statute calls for payment of wage rebates in the form of negotiable, duty-refund certificates, issued on a calendar year basis.[3] The statute specifies that the amount of the certificate, and hence the amount of the rebate, is to be directly proportional to the amount of wages paid in the applicable year. The Secretaries of the U.S. Department of Commerce and the U.S. Department of Interior (herein "Commerce") are directed by the statute to verify the wages paid in that year and to issue the certificate based on the amount of those wages. However, the statute does not call for issuance of the certificate until March of the following year.
 
 
 11
 In considering Timex's application for a rebate certificate for its 1995 production, Commerce construed the statutory provision and based thereon rejected Timex's application. In a letter, and in a subsequent decision memorandum, Commerce opined that the statute requires that the applicant be a "producer" in the year in which the certificate is issued, i.e., in the following year. See Director's Letter of Sept. 27, 1995, at 1; Secretaries' Decision of Jan. 25, 1996, at 2. Timex was a "producer" in the Virgin Islands in 1995, producing in that year over three-hundred thousand watches and paying nearly $1.5 million in wages. However, because Timex ceased its Virgin Islands operations at the end of 1995, it was not a "producer" there in the following year, 1996. Commerce decided, therefore, based on its statutory construction, that Timex was not entitled to a certificate for its 1995 production.
 
 
 12
 The precise question presented is whether, in order to qualify for a rebate certificate for wages paid in the applicable year, the statute requires that the certificate applicant be a "producer" in the insular possessions in the following year. On Timex's appeal to the Court of International Trade, that court reviewed a portion of the statute and concluded that it "does not speak directly to the question" and that therefore the only matter for review is whether Commerce's statutory construction is reasonable. Timex, 969 F.Supp. 1345, 1347-48 (Ct. Int'l Trade 1997) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Finding Commerce's statutory construction reasonable, the trial court affirmed Commerce's decision. See id. at 1349.
 
 DISCUSSION
 
 13
 I. The Initial Question of 'Chevron' Deference
 
 
 14
 We do not fulfill our duty to say what the law is, see Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), by merely agreeing to Commerce's interpretation of the statutory provision at issue if it is 'reasonable,' regardless of whether we think it correct. Rather, before granting an agency's statutory interpretation such great deference (commonly referred to as 'Chevron' deference), we must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 & n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Only if, after this investigation, we conclude that Congress either had no intent on the matter, or that Congress's purpose and intent regarding the matter is ultimately unclear, do we reach the issue of Chevron deference. See id.; cf. Muwwakkil v. Office of Personnel Management, 18 F.3d 921, 925 (Fed.Cir.1994) ("When an agency's interpretation of a statute ... is contrary to the intent of Congress, as divined from the statute and its legislative history, we owe it no deference."). Indeed, if we hastily 'throw up our hands' and declare that Congress's intent is unclear, we abdicate our duty; in essence, we leave statutory construction to an Article II agency, rather than accept the responsibility the Constitution imposes on Article III courts. See Marbury, 5 U.S. (1 Cranch) at 177.
 
 
 15
 To ascertain whether Congress had an intention on the precise question at issue, we employ the "traditional tools of statutory construction." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. The first and foremost "tool" to be used is the statute's text, giving it its plain meaning. See VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579 (Fed.Cir.1990). Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter. See Muwwakkil, 18 F.3d at 924 ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails."); West Virginia Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 98-99, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991).
 
 
 16
 If, on the other hand, the statute's text does not explicitly address the precise question, we do not at that point simply defer to the agency. Our search for Congress's intent must be more thorough than that. The Supreme Court made this clear in Chevron: "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (emphasis added). Beyond the statute's text, those "tools" include the statute's structure, canons of statutory construction, and legislative history. See Dunn v. Commodity Futures Trading Com'n, 519 U.S. 465, ----, 117 S.Ct. 913, 916-20, 137 L.Ed.2d 93 (1997) (considering the overall statute, a canon of statutory construction, and legislative history to ascertain Congress's intent, when more than one reading of the literal text of the particular statutory phrase at issue is possible); Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed.Cir.1997) (noting that Congress's intent is determined from the statute and its legislative history (quoting Muwwakkil, 18 F.3d at 925)); Chevron, 467 U.S. at 859-63, 104 S.Ct. 2778 (in investigating Congress's intent, considering the language and structure of the statute, canons of statutory construction, and legislative history).
 
 
 17
 This is not to suggest that these other tools can override a statute's unambiguous text. See VE Holding, 917 F.2d at 1579. Rather, this recognizes that before we can allow an agency to say what the law is, we must thoroughly investigate whether Congress had an intent on the matter. See Dunn, at ---- n. 14, 117 S.Ct. at 920 n. 14 (after investigating Congress's intent by using various tools of statutory construction beyond the literal text of the statutory phrase, which was open to multiple readings, holding that Chevron deference is improper because Congress's intent is clear); Dole v. United Steelworkers of Am., 494 U.S. 26, 42-43, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (same). Only if after this investigation we are still at a loss as to what Congress intended do we grant Chevron deference. See id. That is not the case here.
 
 II. Congress's Intent
 A.
 
 18
 Turning first to the statute to ascertain Congress's intent, see VE Holding, 917 F.2d at 1579, the rebate program at issue is specified in paragraph (h) of note 5, repeated here for convenience (emphasis added):
 
 
 19
 (h) (i) In the case of each calendar year beginning after December 31, 1982, and before January 1, 2007, the Secretaries, acting jointly, shall:
 
 
 20
 (A) verify the wages paid by each producer to permanent residents of the insular possessions during the preceding calendar year; and
 
 
 21
 (B) issue to each producer (not later than March 1 of such year) a certificate for the applicable amount.
 
 
 22
 (ii) ... "[A]pplicable amount " means an amount equal to the sum of:(A) 90 percent of the producer's creditable wages ... during the preceding calendar year of the first 300,000 units; plus
 
 
 23
 (B) the applicable graduated declining percentage ... of the producer's creditable wages ... during the preceding calendar year of units in excess of 300,000 but not in excess of 750,000.
 
 1.
 
 24
 Initially, Congress's intent on the matter is seen in the text and structure of subparagraph (i). On its face, the subparagraph contains two distinct clauses: the 'verification' clause (A), and the 'issuance' clause (B). The verification clause (A) creates a prerequisite for certificate applicants and requires Commerce (more precisely the Secretaries) to verify that prerequisite. In particular, the clause requires Commerce to verify the wages paid by producers during the preceding year. Thus, the clause specifies, as a prerequisite, that the certificate applicant have paid wages to permanent residents of the insular possessions during the preceding year; the clause directs Commerce to verify this prerequisite. No other verification is required.
 
 
 25
 The issuance clause (B), in contrast, does not require any verification or otherwise create an additional prerequisite. Rather the clause directs Commerce to issue to each producer a rebate certificate for the "applicable amount," which subparagraph (ii) defines as a percentage of the amount of wages paid during the preceding year. The purpose and function of the clause is to specify the date by which Commerce must issue certificates (March 1 of the following year) and the amounts of the certificates (the "applicable amount[s]").
 
 
 26
 Properly read, the clause does not require, as an additional prerequisite, that the applicant be a "producer" in that following year. Such a requirement would in effect be a prerequisite that the applicant have paid wages in the year after the year for which the rebate is earned. However, no such prerequisite is required by the statute. Thus, subparagraph (i) only requires that the applicant have been a "producer" in the preceding year, having paid wages during that year. See Brown v. Gardner, 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (when a statute expressly required only lack of claimant's fault, it is unreasonable to read into the statute the additional requirement of defendant's fault).
 
 
 27
 Commerce erroneously construed subparagraph (i) as additionally requiring that the applicant be a "producer" during the following year:
 
 
 28
 A plain reading of [the provision's] language establishes two prerequisites ...:(1) That the watch producer have paid wages ... in the preceding year and (2) that the intended recipient ... actually be a watch producer [during the following year].
 
 
 29
 Director's Letter of Sept. 27, 1995, at 1; see also Secretaries' Decision of Jan. 25, 1996, at 2. In other words, Commerce read subparagraph (i) as requiring that the applicant be a "producer" in the preceding year and a "producer" in the following year, that is, in the year in which Commerce is required to issue the certificate. Commerce divined its 'following-year producer' requirement from the issuance clause (B) based on the presence of the word "producer." See id. However, reading a 'following-year producer' requirement into the issuance clause is contrary to its just-explained purpose and function. Furthermore, it is at odds with the verification clause (A), because a 'following-year producer' requirement in effect requires that the applicant have paid wages during the following year, but only verification of the preceding year's wages is specified.
 
 2.
 
 30
 Commerce additionally argues that a 'following-year producer' requirement follows from its regulatory definition of a "producer." The regulations in essence define "producer" as a watch manufacturer in the insular possessions that is entitled to receive allocations for duty-free entry of watches. See 15 C.F.R. § 303.2(a)(6), (9), (12) (1997). From that general definition, Commerce divines a regulatory requirement that to qualify as a producer entitled to the rebate one must be a producer in the following year. But that general definition does not help Commerce's case.
 
 
 31
 In the first place, the regulatory definition section does not purport to address the question at issue. In the second place, even if it did, the agency by regulation cannot impose, either implicitly or explicitly, a requirement that Congress did not intend to have imposed.
 
 
 32
 In the end, this case does not turn on how the word "producer" is defined, because Timex seeks a rebate certificate for the wages it paid to residents of the Virgin Islands in 1995, and it is undisputed that, in that year, Timex was a "producer," even under Commerce's regulatory definition. Rather than turning on the abstract definition of "producer," the case turns on when the applicant is required to be a "producer." Commerce appears to have reasoned that the applicant must be a producer in the following year because the statute calls for issuance of the certificate by March 1 of the following year. However, that the statute calls for issuance of the certificate in the following year is merely a recognition of the accounting reality: the certificate defined by the amount of wages paid in the preceding year cannot be issued until the following year because those wages cannot be verified until after the preceding year. The statute's recognition of that accounting reality does not create a 'following-year producer' requirement.
 
 
 33
 In fact, the presence of the word "producer" in paragraph (h) indicates just the opposite. The first appearance of the word "producer" in paragraph (h) is with respect to the preceding year, i.e., "verify the wages paid by each producer ... during the preceding calendar year." Thus, in the first instance, the temporal context of the word "producer" is the preceding year. It is well-settled that words appearing in a statute should be read consistently: a particular word appearing multiple times in a statutory provision should be given the same reading, unless there is a clear Congressional intent to the contrary. See Brown, 513 U.S. at 118, 115 S.Ct. 552. This canon is particularly relevant here because the occurrence of the word "producer" upon which Commerce's 'following-year producer' requirement relies appears in the same sentence, i.e., in clause (B) of subparagraph (i). See id.
 
 
 34
 Accordingly, the word "producer" in clause (B) should be read in the same temporal context, i.e., the preceding year. There is no clear Congressional intent to the contrary. Indeed, the word "producer" appears in clause (B) without temporal modification: "issue to each producer (not later than March 1 of such year) a certificate...." To shift the context as sharply as Commerce has done--from one year to the next--clear language (absent here) would be required.[4]
 
 3.
 
 35
 The statutory text also reveals that Congress, in enacting paragraph (h), created and intended a rebate program that provides a rebate for those wages paid to residents of the insular possessions in connection with the production of watches. Subparagraph (i) specifies that Commerce is to verify the wages paid by a manufacturer in a given year ("the preceding year") and to issue in the following year a certificate for the "applicable amount." Subparagraph (ii) specifies that the "applicable amount" is a percentage of those wages paid in the preceding year. Thus, the certificate issued in a particular year provides in effect a rebate of a percentage of the wages paid in the preceding year. In other words, Congress created a yearly wage-rebate, paid in the form of a negotiable certificate.
 
 
 36
 Commerce's 'following-year producer' requirement is contrary to the character of the rebate program created by Congress. By definition and common usage, a rebate is "a retroactive abatement ... usu. as consideration for a specified volume of business." Webster's Third New International Dictionary 1892 (1986); see also Webster's II New College Dictionary 924 (1995) (defining rebate as "a return of part of a price paid" or "a deduction from an amount charged"). As such, rebates are commonly issued after the price is paid. For example, in the case of the typical rebate offered by manufacturers of consumer products, the consumer receives the rebate after purchasing the product and mailing a request for the rebate to the manufacturer. The rebate program created by Congress is no different. After paying wages to residents of an insular possession in a given year, a watch manufacturer requests of Commerce a rebate based on the amount of wages paid in that year.
 
 
 37
 This incentive mechanism is quite different from one which provides for a current discount at the time of purchase, for example by the familiar grocery coupon redeemable only at the time one qualifies as a purchaser of the discounted product. Conditioning the rebate for wages paid in a given year on the payment of wages in the following year--as Commerce has done through its 'following-year producer' requirement--is illogical and contrary to the very nature of a rebate program. It converts a rebate incentive into the discount-on-future-purchases (or in this case, on future production) type incentive mechanism.
 
 B.
 
 38
 Our conclusion that Commerce's imposition of a 'following-year producer' requirement is contrary to Congress's intent is further supported by the legislative history and the canon against construing a statute in a manner that produces absurd results.
 
 1.
 
 39
 The legislative history makes clear (in fact it is undisputed) that the purpose of the rebate program was to increase the incentive for manufacturers to engage in watch production in the insular possessions. Prior to enactment of the rebate program in 1983,[5] there already was a discount-on-future-production type incentive in place for watch production in the insular possessions: namely, watches produced there could be imported duty-free. See S.Rep. No. 97-564, at 14 (1982), reprinted in 1982 U.S.C.C.A.N. 4078, 4091. For many years that duty-free treatment was a sufficient incentive to cause substantial watch production in the insular possessions. See id.
 
 
 40
 However, circumstances changed in the 1980s, when market preferences shifted from mechanical watches to quartz watches. See id. Rather than make the substantial investment needed to refit their factories to produce quartz watches, manufacturers with production facilities in the insular possessions decreased their production or left altogether--in fact, over half the industry closed down. See id. Congress enacted the rebate program to provide an additional incentive, on top of duty-free treatment, to reverse this trend and spur quartz watch production in the insular possessions: "The intent of this provision is to spur production in the insular possessions and to encourage those producers who are there to stay and those producers who have left to potentially return." Id.
 
 
 41
 The legislative history indicates that, to stimulate the watch industry, Congress intended a rebate for wages to effectively reduce labor costs, which are apparently higher in the insular possessions than in competing foreign countries. See id. at 12-13, 1982 U.S.C.C.A.N. at 4089-90 (The legislation would "provide[ ] a duty rebate for the industry on a by-company basis which would reflect the amount of local labor content in the watches.... The Secretaries would verify the wages paid ... in the preceding calendar year and would ... issue a certificate ... reflecting the amount of wages paid."); H.R.Rep. No. 97-989, at 46 (1982), reprinted in 1982 U.S.C.C.A.N. 4137, 4146.
 
 
 42
 Commerce's 'following-year producer' requirement adds an unintended cost to duty-refund certificates and is therefore contrary to Congress's purpose and intent of significantly increasing the incentive for watch production in the insular possessions. Congress intended the 'price' of duty-refund certificates to be the payment of those wages upon which the certificate amount is based. Commerce's 'following-year producer' requirement in effect adds to that intended price the payment of wages in the following year, which by the very terms of the statute does not come into play when determining the amount of the certificate. By increasing the price watch manufacturers must pay to receive rebate certificates, Commerce has diminished the incentive Congress intended.
 
 2.
 
 43
 Finally, Commerce's 'following-year producer' requirement violates the canon that a statutory construction that causes absurd results is to be avoided if at all possible. See Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940) (a reading of a statute that "would lead to absurd results is to be avoided when [it] can be given a reasonable application consistent with [its] words and with the legislative purpose"); United States v. X-Citement Video, Inc., 513 U.S. 64, 68-69, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); Green v. Bock Laundry Mach. Co., 490 U.S. 504, 527-29, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring). Under Commerce's statutory construction, a watch manufacturer that stays a few days into the new year (perhaps as few as one day) may qualify for a rebate certificate for the wages it paid during the preceding year, whereas a manufacturer that leaves at or just before the end of the preceding year does not.
 
 
 44
 When probed on this matter at oral argument, Commerce's attorney was unable to explain away or justify this absurdity. When first asked whether Timex would have qualified for a certificate for the wages it paid in 1995 had it continued its Virgin Islands operations through January 30, 1996, the attorney responded with a definite "yes." However, when then asked whether Timex would have similarly qualified if it had continued merely through January 15, 1996, or perhaps January 1, 1996, the attorney hesitated and attempted to backtrack, apparently recognizing the absurdity of Commerce's position. In the end, Commerce's attorney was unable to explain how the line could be drawn in any sensible way.
 
 
 45
 Commerce's inability to make sense of its statutory construction is understandable, because it makes no sense. The result is nonsensical not merely because that, under Commerce's construction, a manufacturer that stays a few more days into the new year qualifies, whereas one that does not stay a few additional days does not qualify;[6] here there is the additional fact that the 'following-year producer' requirement serves no useful purpose.
 
 
 46
 For one, contrary to Commerce's arguments, the 'following-year producer' requirement does not encourage watch manufacturers to stay in the insular possessions. All it does is encourage manufacturers to stay a few more days into the new year, to qualify for a rebate certificate for wages paid during the preceding year. That does not meaningfully serve Congress's purpose of creating and maintaining a watch industry in the insular possessions. It just encourages game playing.
 
 
 47
 The present case provides a perfect example. Timex did not have notice of Commerce's 'following-year producer' requirement. The requirement is not contained in the statute, it is not contained in Commerce's regulations, and it is not expressed in any binding published policy guidance or official opinion. If Timex had been placed on notice, in all likelihood it would have decided (like any sensible business entity) to keep quiet about its plans to leave and instead stay on a few days into January, 1996. Or, worse yet, Timex would have closed its doors early in 1995, so as not to pay substantial wages for which it would not receive a rebate. Either way, Congress's intent is not served.
 
 
 48
 Secondly, the 'following-year producer' requirement bears no relationship to the benefit provided to the watch manufacturer by Congress's rebate program. Regardless of how long the manufacturer stays into the new year, the benefit is the same because the amount of the rebate certificate is, by statute, based only on the amount of wages paid during the preceding year. Imposing a requirement that does not affect the amount of the rebate and that does not meaningfully promote the watch industry in the insular possessions is contrary to Congress's purpose.
 
 
 49
 Quite simply, Commerce's 'following-year producer' requirement serves no useful purpose. Instead, Commerce's statutory construction frustrates Congress's intent, encourages undesirable behavior, and produces absurd results. Such statutory construction is to be avoided, not rubber-stamped under the mistaken notion that it is 'reasonable' and thus somehow binding on the courts. See Haggar, 308 U.S. at 394, 60 S.Ct. 337.
 
 
 50
 In summary, the wage-rebate program was enacted in 1983 to encourage watch production in the insular possessions. With respect to Timex, the program was effective: in 1986, and in the absence of notice of a 'following-year producer' requirement, the program lured Timex to build a quartz watch factory in the Virgin Islands. Under the program, Timex employed a substantial number of local residents to whom it paid wages, and produced hundreds of thousands of watches annually through 1995. Congress's purpose in enacting the rebate program was having its intended effect. Subsequently, because of changed conditions, the factory became economically nonviable in the mid-1990s and Timex found it necessary to terminate production at the end of 1995. Commerce's imposition of a 'following-year producer' requirement could not and did not change that fact. Congress's intent, which we are obligated to carry out, dictates that Timex be given a rebate certificate for the wages it paid in 1995.
 
 CONCLUSION
 
 51
 We accordingly reverse the contrary judgment of the Court of International Trade.
 
 REVERSED
 COSTS
 
 52
 Each party to bear its own costs.
 
 
 
 [1]
 More particularly, the decision was initially made by the Director of the Statutory Import Programs Staff of the U.S. Department of Commerce ("Director") in a September 27, 1995, letter to Timex. On review, the Director's decision was affirmed by the Secretaries of the U.S. Department of Commerce and the U.S. Department of Interior ("Secretaries"). For simplicity, we refer to the Director and the Secretaries, individually and collectively, as "Commerce."
 
 
 [2]
 Uruguay Round Agreements Act, Pub.L. No. 103-465, § 602(a), 108 Stat. 4809, 4991 (1994)
 
 
 [3]
 The negotiable certificate entitles the holder to a refund (equal to the face value of the certificate) of duties paid on watches imported from countries other than the insular possessions, imports that are not otherwise accorded duty-free treatment. See Harmonized Tariff Schedule of the United States, § XVIII, ch. 91, Additional U.S. Note 5, paras. (h)(v), (vi) (Supp. I 1995)
 
 
 [4]
 Alternatively reading all occurrences of the word "producer" in paragraph (h) as referring to the following year would be similarly at odds with the statutory language. For one, clause (A) refers to "each producer ... during the preceding year." Furthermore, such a reading would eliminate the requirement that the applicant have been a producer in the preceding year; that makes no sense because the certificate is based upon wages paid during the preceding year
 
 
 [5]
 See Act of Jan. 12, 1983, Pub.L. No. 97-446, § 110(h), 96 Stat. 2329, 2332-33
 
 
 [6]
 The law contains examples of sharp dividing lines, for example, statutes of limitation, which are deemed necessary because of the policy interests involved. No such clearly enacted bright line exists here, and no such policy interests are involved in this case that would justify such a line even if it could be drawn