# United States Court of Appeals for the Federal Circuit

---

**HYUNDAI STEEL COMPANY, SEAH STEEL CORP., NEXTEEL CO., LTD.,**
*Plaintiffs-Appellees*

**HUSTEEL CO., LTD.,**
*Plaintiff*

**v.**

**UNITED STATES, CALIFORNIA STEEL INDUSTRIES, IPSCO TUBULARS INC., MAVERICK TUBE CORPORATION,**
*Defendants*

**WELSPUN TUBULAR LLC USA,**
*Defendant-Appellant*

---

2021-1748

---

Appeal from the United States Court of International Trade in Nos. 1:18-cv-00169-CRK, 1:18-cv-00173-CRK, 1:18-cv-00177-CRK, 1:18-cv-00178-CRK, Judge Claire R. Kelly.

---

Decided: December 10, 2021

---

HENRY DAVID ALMOND, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for plaintiff-appellee Hyundai Steel Company. Hyundai Steel Company and NEXTEEL Co., Ltd. also represented by LESLIE BAILEY, KANG WOO LEE, JAEHONG DAVID PARK, DANIEL WILSON.

JEFFREY M. WINTON, Winton & Chapman PLLC, Washington, DC, argued for plaintiff-appellee SeAH Steel Corp. Also represented by MICHAEL JOHN CHAPMAN, JOOYOUN JEONG, VI MAI.

ELIZABETH DRAKE, Schagrin Associates, Washington, DC, argued for defendant-appellant. Also represented by BENJAMIN JACOB BAY, NICHOLAS J. BIRCH, CHRISTOPHER CLOUTIER, GEERT M. DE PREST, WILLIAM ALFRED FENNELL, LUKE A. MEISNER, KELSEY RULE, ROGER BRIAN SCHAGRIN.

_____

Before O'MALLEY, BRYSON, and HUGHES, *Circuit Judges.*

BRYSON, *Circuit Judge.*

Appellant Welspun Tubular LLC USA appeals from a decision of the Court of International Trade ("the Trade Court") regarding an administrative review of an antidumping duty order on welded line pipe from the Republic of Korea. In that review, the Department of Commerce found that a "particular market situation" ("PMS") existed in the Korean market for welded line pipe. Based on that finding, Commerce made an upward adjustment in its calculation of the costs of production of the subject welded line pipe for the two selected respondents, Hyundai Steel

Company and SeAH Steel Corporation, which resulted in enhanced antidumping duties.[1]

The Trade Court overturned Commerce's determination on the ground that Commerce was not statutorily authorized to adjust the exporters' costs of production to account for the existence of a PMS. The court also found that Commerce's determination that a PMS existed in Korea was unsupported by substantial evidence. We agree with the Trade Court that the 2015 amendments to the antidumping statute do not authorize Commerce to use the existence of a PMS as a basis for adjusting a respondent's costs of production to determine whether a respondent has made home market sales below cost. In light of our decision on the statutory construction issue, it is unnecessary for us to decide whether Commerce's finding of a PMS was supported by substantial evidence.

## I

### A

The administrative review at issue in this case focused on sales of welded line pipe made by Hyundai and SeAH between May 22, 2015, and November 30, 2016. After its investigation, Commerce issued a preliminary determination finding that sales of welded line pipe in the United States had been made below "normal value." Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016, 83 Fed. Reg. 1,023 (Jan. 9, 2018). In determining normal value, Commerce found that a PMS existed in Korea during the review period. Based on that finding, Commerce made an upward adjustment to the costs of production for both Hyundai and SeAH. *See id.*; Decision Memorandum for the Preliminary

---

[1]    In addition to Hyundai and SeAH, Commerce's review also covered 22 respondents who were not specifically examined.

Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea (Dep't Commerce Jan. 9, 2018) ("Preliminary Memo"), https://enforcement.trade.gov/frn/summary/korea-south/2018-00183-1.pdf.  When Commerce issued its final determination on July 18, 2018, it continued to apply that upward adjustment.[2]  *See* Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018); Issues and Decision Memorandum for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Welded Line Pipe, at 23 (Dep't Commerce July 18, 2018) ("Final Memo"), https://enforcement.trade.gov/frn/summary/korea-south/2018-15327-1.pdf.  Based in part on that upward adjustment, Commerce found that Hyundai and SeAH were selling welded line pipe for less than fair value in the United States and therefore assessed antidumping duties against them.

B

In general, when Commerce determines whether a product is being sold for less than fair value, it must make "a fair comparison . . . between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).[3]  The normal value of merchandise is ordinarily

---

[2]   Commerce subsequently amended its final determination to correct for a ministerial error.  *See* Welded Line Pipe from the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016, 83 Fed. Reg. 39,682 (Aug. 10, 2018).  That amendment is not relevant to this appeal.

[3]   The export price and constructed export price generally refer to the price at which the exporter sells the subject merchandise to an unaffiliated purchaser in the United States, subject to various adjustments.  *Id.* § 1677a(a)–(b).

determined by the price at which comparable goods were sold in the exporter's home market during the period of review. In determining normal value, Commerce looks first at home market sales of comparable goods; it may also use third-country market sales of comparable goods as the basis for normal value if certain conditions are met. *See id.* § 1677b(a)(1)(C). In either case, Commerce is directed to exclude sales made below the exporter's cost of production. *Id.* § 1677b(b)(1). That inquiry is referred to as the "sales-below-cost test." If all market sales in the ordinary course of trade[4] fail the sales-below-cost test (i.e., those sales are all below the exporter's cost of production), then Commerce may base normal value on the constructed value of the goods.[5] *Id.* However, if there are market sales in the ordinary course of trade that pass the sales-below-cost test, Commerce must use those sales in determining normal

---

[4]    The antidumping statute defines "ordinary course of trade" to mean "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15). It then provides that the following sales and transactions, "among others," are outside the ordinary course of trade: "[s]ales disregarded under section 1677b(b)(1)"; "[t]ransactions disregarded under section 1677b(f)(2)"; and "[s]ituations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price." *Id.*

[5]    "Constructed value" seeks to approximate the normal value by summing the exporter's cost of production, any selling or administrative expenses incurred by the exporter, profit realized by the exporter on the sale of the goods, and any expenses associated with packing the merchandise for shipment to the United States. 19 U.S.C. § 1677b(e).

value unless it makes one of a few specified findings, such as that a PMS "prevents a proper comparison with the export price or constructed export price." *Id.* § 1677b(a)(1)(B)(ii)(III); *see also id.* § 1677b(a)(1)(C)(iii).[6]

Here, Commerce based Hyundai's normal value on home market sales and SeAH's normal value on third-country sales. Preliminary Memo at 15 (discussing Hyundai); J.A. 27 (discussing SeAH). Accordingly, Commerce applied the sales-below-cost test to determine which of those sales should be included in the normal value calculation. *See* Preliminary Memo at 21. With respect to both respondents, Commerce calculated normal value using the respondents' market sales above the cost of production, as provided in section 1677b(b). To determine the dumping margins that are now before the court, Commerce did not calculate either respondent's normal value using the constructed value provision, section 1677b(e).[7]

Section 1677b(b)(3) sets forth a specific methodology for calculating the cost of production for a particular product for purposes of the sales-below-cost test:

---

[6]    In the principal opinion below, Judge Kelly reviewed in some detail the complex statutory scheme governing Commerce's determination whether merchandise is sold at less than fair value. *Husteel Co. v. United States*, 426 F. Supp. 3d 1376, 1383–87 (Ct. Int'l Trade 2020). In light of her discussion, we have provided only a brief summary of that scheme.

[7]    In its first final determination, Commerce calculated SeAH's normal value using constructed value. Final Memo at 46. Commerce subsequently altered its calculation of SeAH's normal value to use SeAH's third country sales, and those sales form the basis for the dumping margins at issue in this appeal. J.A. 27.

> For purposes of this part, the cost of production shall be an amount equal to the sum of—
>
> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;
>
> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and
>
> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3). Section 1677b(e) contains a similar methodology for calculating the constructed value of a product, although constructed value also includes an amount for profits. *Id.* § 1677b(e).

In 2015, Congress enacted the Trade Preferences Extension Act ("TPEA"), which amended the constructed value calculation statute, section 1677b(e), to include the following proviso:

> [I]f a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504, 129 Stat. 362, 385 (2015); *see also* 19 U.S.C. § 1677b(e). Thus, the TPEA enabled Commerce to adjust

the calculation methodology for determining constructed value when it finds that a PMS exists.

In its final determination, Commerce found that a particular market situation existed with respect to hot-rolled coil ("HRC") and electricity, key inputs in the production of welded line pipe. Final Memo at 13–14. Specifically, Commerce identified four factors that collectively impacted the cost of production of welded line pipe: (1) Korean government subsidies of Korean steel producers, including HRC producers; (2) overcapacity in Chinese steel production, which put downward pressure on Korean domestic HRC prices, (3) "strategic alliances" among companies in the Korean steel industry that resulted in favorable HRC prices to some domestic Korean producers; and (4) "government involvement in the Korean electricity market." *Id.* Commerce was able to quantify only the first factor, the Korean HRC subsidies. Commerce used that factor to adjust Hyundai's and SeAH's costs of production when conducting the sales-below-cost test. *Id.* at 23–24.

In support of its adjustment to the respondents' costs of production for purposes of the sales-below-cost test, Commerce relied on the amendment to section 1677b(e), which allows for an adjustment to constructed value, to justify its use of an adjustment to Hyundai's and SeAH's costs of production. Commerce explained:

> Section 504 of the TPEA added the concept of "particular market situation" in the definition of the term "ordinary course of trade," for purposes of [constructed value] under section 773(e) of the Tariff Act of 1930, as amended (the Act), and through these provisions for purposes of the [costs of production] under section 773(b)(3) of the Act.

*Id.* at 12.

C

Four Korean respondents, including Hyundai and SeAH, filed an action in the Trade Court challenging Commerce's final determination. Their challenge focused mainly on Commerce's determination that a PMS existed and Commerce's consequent adjustment to the respondents' costs of production. After briefing and argument, the Trade Court held that the antidumping statute did not permit Commerce to use PMS as a basis for making an adjustment to the respondents' costs of production and remanded the matter to Commerce. *Husteel*, 426 F. Supp. 3d 1376, 1389 (Ct. Int'l Trade 2020).

After explaining in detail the various ways in which the antidumping statute authorizes Commerce to calculate normal value and to conduct a comparison between normal value and export price (or constructed export price), the Trade Court held that, in this case, "Commerce chose a path not permitted by the statutory scheme." *Id.* at 1387. In particular, the court explained, "Commerce misappropriated the language of 19 U.S.C. § 1677b(e), which provides that when using constructed value, Commerce may use any reasonable calculation method if it finds a PMS affected the [cost of production]." *Id.*

The Trade Court focused on Commerce's statement that the TPEA had added the concept of "particular market situation" in the definition of "ordinary course of trade" for purposes of constructed value under section 1677b(e), and "through these provisions" for purposes of the cost of production and the sales-below-cost test under section 1677(b). The court rejected Commerce's position and concluded that "there is nothing in the statutory scheme which can be read to grant Commerce the authority to modify the [sales-below-cost] test to account for a PMS." *Id.* The court therefore remanded the matter to Commerce for further proceedings consistent with the court's ruling.

On remand, Commerce acquiesced in the court's ruling on the PMS issue under protest. A second proceeding before the Trade Court and a second remand followed, addressing issues not relevant to this appeal. *Husteel Co. v. United States,* 463 F. Supp. 3d 1334 (Ct. Int'l Trade 2020). Following that remand, the Trade Court entered judgment on Commerce's determination of antidumping duties, as revised in accordance with the court's remand orders. *Husteel Co. v. United States*, 494 F. Supp. 3d 1287 (Ct. Int'l Trade 2021).[8]

## II

In this appeal, Welspun argues that Commerce reasonably interpreted the antidumping statute and was therefore justified in adjusting Hyundai's and SeAH's costs of production to account for a PMS.

## A

We have held that when Commerce interprets statutes in the course of antidumping proceedings, those interpretations are entitled to deference under the *Chevron* doctrine. *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory interpretations articulated by Commerce during its antidumping

---

[8]    Like Judge Kelly in this case, the other judges of the Trade Court who have addressed the PMS issue have all held that, for purposes of the sales-below-cost test, Commerce is not authorized to make adjustments to a respondent's costs of production to account for a PMS. *See, e.g.*, *Saha Thai Steel Pipe Pub. Co. v. United States*, 422 F. Supp. 3d 1363, 1369–70 (Ct. Int'l Trade 2019) (Choe-Groves, J.); *Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*, 426 F. Supp. 3d 1395, 1411–12 (Ct. Int'l Trade 2020) (Restani, J.); *Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1337–41 (Ct. Int'l Trade 2020) (Katzmann, J.).

proceedings are entitled to judicial deference under *Chevron*."); *see generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

When evaluating an agency's interpretation of a statute under *Chevron*, we must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If the statute is unambiguous, courts "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. However, "[i]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Step one of the *Chevron* analysis requires us to determine whether Congress has expressed an unambiguous intent "using the traditional tools of statutory construction." *Atilano v. McDonough*, 12 F.4th 1375, 1380 (Fed. Cir. 2021); *Timex, V.I., Inc. v. United* States, 157 F.3d 879, 882 (Fed. Cir. 1998); *see Chevron*, 467 U.S. at 843 n.9. Commerce has interpreted the 2015 amendment to section 1677b(e) to permit an adjustment to a respondent's costs of production. In view of the text and structure of the antidumping statute, as amended by the TPEA, we disagree with Commerce's interpretation of the statute, and for the reasons set forth below, we hold that Commerce's interpretation fails at *Chevron* step one.

B

The structure of section 1677b, as amended by the TPEA, clearly indicates that Congress intended to limit PMS adjustments to calculations pursuant to the "constructed value" subsection, 19 U.S.C. § 1677b(e), and not to authorize Commerce to make such adjustments pursuant to the "cost of production" subsection, *id.* § 1677b(b).

To begin with, the provisions governing the calculation of "cost of production" and "constructed value" contain similar language but are delineated separately. *See* 19 U.S.C.

§ 1677b(b)(3) (cost of production); *id.* § 1677b(e) (constructed value). Yet the TPEA amendment that allowed the use of a different calculation methodology if a PMS exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," TPEA § 504(c), was made to the constructed value subsection, not to the cost of production subsection. If Congress had intended to allow a PMS adjustment to be made when calculating the cost of production for purposes of applying the sales-below-cost test, it presumably would have amended the cost of production subsection as well as the constructed value subsection. But it did not.

The Supreme Court has observed that, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted); *see also Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1350–51 (Fed. Cir. 2015); *Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States*, 13 F.3d 398, 401–02 (Fed. Cir. 1994). Because Congress amended section 1677b(e) to allow for a PMS adjustment, but did not amend section 1677b(b), it is reasonable to infer that Congress intended for the PMS adjustment to be available for calculations of constructed value, but not for calculations of the cost of production.[9]

---

[9]    Welspun objects to this line of reasoning as an improper application of the canon of statutory construction referred to as *expressio unius est exclusio alterius*. Welspun notes that courts have been hesitant to rely on that canon in the administrative law context. *See, e.g., Cheney R. Co. v. Interstate Com. Comm'n*, 902 F.2d 66, 68–69 (D.C. Cir.

That inference is reinforced by the limiting language of Congress's amendment to section 1677b(e). The proviso that allows for an adjustment to constructed value to account for a PMS is explicitly limited to being used "[f]or purposes of paragraph (1)" of section 1677b(e). 19 U.S.C. § 1677b(e). Section 1677b(e)(1) instructs Commerce to include in its calculation of constructed value "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise." Thus, the proviso allowing for a PMS adjustment to constructed value is explicitly limited to one portion of the constructed value calculation. The limiting phrase "[f]or purposes of paragraph (1)" strongly suggests that Congress intended for the adjustment to be limited not only to section 1677b(e), but also specifically to a single paragraph within that section.

Other amendments made to section 1677b by the TPEA provide further support for the Trade Court's construction of the antidumping statute. The TPEA amended the definition of "ordinary course of trade" to include "[s]ituations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677(15). At the same time, the TPEA changed the language of the last clause of section 1677b(e)(1), which describes the cost-of-materials component of the constructed value calculation. Before the TPEA, that clause referred to the cost of materials that would ordinarily permit the production of the merchandise "in the ordinary course of business." The TPEA amended that clause to refer to the cost of materials that would

1990). Our analysis, however, does not rest solely, or even primarily, on the *expressio unius* canon. To the extent that canon is applicable, it merely reinforces the natural conclusions that can be drawn from the text and structure of the antidumping statute and the TPEA amendments.

ordinarily permit the production of the merchandise "in the ordinary course of trade."

That change provided a clear link between section 1677b(e) and section 1677(15). Yet the TPEA made no such change to the last clause of section 1677b(b)(3), the parallel provision of the cost of production subsection. That clause continues to refer to the cost of materials that would ordinarily permit the production of the merchandise "in the ordinary course of business." Thus, while the TPEA amendment to section 1677(15) linked the constructed value subsection with "situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or the constructed export price," *id.* § 1677(15), the amendment established no such link with the cost of production subsection.

Welspun argues that the antidumping statute must be regarded as ambiguous with regard to the issue before the court because it is silent as to whether, for purposes of the sales-below-cost test, Commerce may adjust costs of production to account for a PMS. We disagree. It is true that the antidumping statute does not explicitly prohibit adjusting the costs of production because of a PMS. But Congress's failure to expressly forbid the use of cost-of-production adjustments based on a PMS does not authorize Commerce to make such adjustments. To the contrary, "the absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia S.P.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002); *see also Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 659 (D.C. Cir.) (en banc) (refusing to "presume a delegation of power from Congress absent an express withholding of such power" (emphasis omitted)), *amended*, 38 F.3d 1224 (D.C. Cir. 1994).

For a statute to be considered silent under *Chevron* step one, there must be a "gap left, implicitly or explicitly,

by Congress" that Commerce is entitled to fill. *Chevron*, 467 U.S. at 815; *see also Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (refusing to give *Chevron* deference to an agency interpretation of a statute where Congress "left no gap in [the statute] for the agency to fill"). In enacting the TPEA, Congress did not leave a gap for Commerce to fill with regard to adjusting the costs of production. Rather, Congress simply and unambiguously allowed for a PMS adjustment to constructed value but not to the costs of production for purposes of the sales-below-cost test. Because Congress left no statutory gap for Commerce to fill, Commerce may not apply a PMS adjustment to the calculation of costs of production under the sales-below-cost test, but "must give effect to the unambiguously expressed intent of Congress" not to allow such an adjustment. *See Chevron*, 467 U.S. at 843.

Welspun also argues that the legislative history of the TPEA indicates that the statute is at least ambiguous. For support, Welspun cites three statements from the legislative history: First, the Senate Report on the TPEA noted that the amendments to section 1677b were designed to give Commerce "flexibility in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114-45 at 37 (2015). Second, during the House debate on the TPEA, Representative Patrick Meehan noted that the bill "gives Commerce the kind of discretion to be able to look at the facts and to take recalcitrant countries and hold them accountable by creating what is accurate." 161 Cong. Rec. H4655, H4690 (daily ed. June 25, 2015). Third, Senator Sherrod Brown noted that his proposed Level the Playing Field Act, which served as the basis for some of the TPEA's provisions, was designed in part to address distorted production costs in the Korean pipe industry. *See* 161 Cong. Rec. S2897, S2900 (daily ed. May 14, 2015).

Those statements are all very general in scope, and none specifically addresses adjusting either constructed value or the costs of production to account for a PMS. As a

result, we are unpersuaded that the legislative history indicates any intent on the part of Congress to leave a gap regarding the use of a PMS adjustment in the calculation of an exporter's costs of production for purposes of the sales-below-cost test.

Finally, Welspun argues that limiting the use of a PMS adjustment to calculations of constructed value would lead to "absurd" results. Specifically, Welspun argues that, "[i]f Commerce were not to make a PMS adjustment, certain sales that would have otherwise been disregarded under the sales-below-cost test would remain in the normal value based on the unadjusted effect of PMS-distorted transactions or costs." Appellant's Reply Br. 21. The problem, Welspun argues, is that "[t]he inclusion of such sales in normal value would contravene the general mandate that normal value must be calculated so as to permit a fair or proper comparison with the export price or constructed export price." *Id.* We disagree that the statute necessarily leads to that result.

When Commerce determines normal value, it may depart from using home-market sales if it finds that a "particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(C)(iii); *see also id.* § 1677b(a)(1)(B)(ii)(III) (providing a similar mechanism for excluding third-country sales). Although Commerce must make a slightly different finding from that described in section 1677b(e) to trigger those provisions,[10]

---

[10]    The PMS provisions in section 1677b(a)(1) require a finding that a PMS exists such that there cannot be "a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(C)(iii). By contrast, under section 1677b(e), Commerce may adjust constructed value when a PMS exists "such that the cost of materials and fabrication or other processing of any kind does not

it is not the case that under the Trade Court's construction of the statute Commerce is powerless to address home-market sales that are affected by a PMS yet still pass the sales-below-cost test. To the contrary, section 1677b(a)(1) specifically gives Commerce the tools to ensure "a proper comparison with the export price."[11]    19 U.S.C. § 1677b(a)(1)(C)(iii). In short, neither the text of the TPEA amendments nor the legislative history of the statute supports Welspun's proposed construction of the statute, and the construction adopted by the Trade Court does not have the perverse consequences that Welspun claims.

III

Apart from its reliance on the 2015 TPEA amendments to support Commerce's interpretation of section 1677b(e), Welspun points to subsection (f)(1)(A) of section 1677b as a separate basis to support the application of a PMS adjustment to the respondents' costs of production. In Welspun's

---

accurately reflect the cost of production in the ordinary course of trade." *Id.* § 1677b(e). These are different standards, so in order to trigger the provisions in 1677b(a)(1), Commerce would need to find that the PMS prevents a proper comparison to the export price, not just that the exporter's actual costs do not accurately reflect the costs of production.

[11]    The Trade Court added that its construction of the TPEA amendments is not illogical. The court explained that "[a] PMS that affects costs of production would presumably affect prices for domestic sales and export sales so there would be no reason to adjust only the home market prices." *Husteel*, 426 F. Supp. 3d at 1388. By contrast, "[i]f the PMS was of a kind that only affected domestic sales, then it would be one which prevented 'a proper comparison with the export price or constructed export price' and Commerce would move to either third country sales or constructed value." *Id.* at 1388–89.

view, that provision is "the key mechanism by which any departure from a respondent's normal records and any adjustment[s] to [cost of production] are made." Appellant's Reply Br. 22–23.

Section 1677b(f)(1)(A) states that costs "shall normally be calculated based on the records of the exporter . . . if such records are kept in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). That language authorizes Commerce to make adjustments to reported costs when accounting practices or other circumstances do not accurately reflect the actual costs incurred by the exporter. Welspun suggests that section 1677b(f)(1)(A) extends Commerce's authority to adjust an exporter's costs to cases in which a reported cost accurately reflects what the exporter has paid, but in which the cost was suppressed by a PMS or other factor.

Commerce did not rely on section 1677b(f)(1)(A) in its final determination; it instead relied solely on the TPEA amendments for its authority to adjust the respondents' costs of production due to a PMS when conducting the sales-below-cost test. Nor did Welspun (or any other defendant before the Trade Court) rely on that section in support of Commerce's adjustments in its final determination. And the Trade Court did not address the section 1677b(f)(1)(A) argument that Welspun has now raised. Welspun has therefore not preserved that argument for appellate review. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1378 n.4 (Fed. Cir. 2007); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Moreover, under well-settled principles of administrative law, Commerce's failure to base its ruling in whole or in part on section 1677b(f)(1)(A) means that section 1677b(f) is not available as an alternative ground for upholding Commerce's final determination. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Changzhou Wujin Fine Chem.*

*Factory Co. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012); *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010) ("[W]e review only the bases on which Commerce made its determination."). We therefore do not address Welspun's section 1677b(f)(1)(A) argument in this case.

## IV

Welspun also appeals the Trade Court's holding that Commerce's finding that a PMS existed was unsupported by substantial evidence. Because it was impermissible for Commerce to adjust Hyundai's and SeAH's costs of production to account for a PMS, we need not reach the question whether Commerce's PMS finding was supported by substantial evidence. Accordingly, we uphold the judgment of the Trade Court with respect to both Hyundai and SeAH.

**AFFIRMED**